BATTY v. NIAGARA FALLS HYDRAULIC POWER & MANUFACTURING CO.

(Supreme Court, Appellate Division, Fourth Department. January 18, 1899.)

MASTER AND SERVANT—NEGLIGENCE—INSTRUCTIONS.

In an action against a master to recover for a servant's death through falling débris while engaged in leveling off the slope of an embankment, it is prejudicial error to refuse to charge what specific act would constitute negligence of the master in law, since the jury in such case were left to surmise that they could find from the whole evidence that the master was negligent, without being required to find any specific act or omission constituting the negligence.

Appeal from trial term, Niagara county.

Action by Jennie A. Batty, as administratrix of the estate of William H. Batty, deceased, against the Niagara Falls Hydraulic Power & Manufacturing Company. From a judgment for plaintiff, from an order denying a new trial, and from an order directing the clerk

to include in the judgment interest on the verdict from the date of the death of plaintiff's intestate, defendant appeals. Judgment and order denying new trial reversed, and order directing the adding of interest set aside.

Plaintiff's intestate on the 13th of April, 1896, was in the employ of the defendant as a carpenter. In the complaint it is alleged that on that day the intestate was in the employ of the defendant, and "the said defendant carelessly and negligently failed and omitted to perform the duties aforesaid which it owed unto the said William H. Batty, and in consequence of its carelessness and negligence in that behalf a mass of earth and stone fell upon, and caused the death of, the said William H. Batty, while he was engaged in constructing a platform and scaffold which he was directed to construct by the said defendant, and that the death of said William H. Batty was then and there caused solely by and through the carelessness and negligence of the said defendant." The complaint alleges no specific duty and no specific act of negligence of the defendant, or omission of the defendant, other than "the duty of providing a reasonably safe place, * * * so far as that could be done by the exercise of reasonable care." The defendant owns a canal, the water of which is used for developing power for manufacturing and mechanical purposes at the city of Niagara Falls. Niagara river, below the falls, runs through a deep gorge, with high banks on either side; and near the top of the American bank is the so-called canal basin of the defendant, from which for many years water has flown through many flumes over the bank down into the river, running the wheels of many mills and factories located on the edge of the high bank. The distance from the water's edge of the Niagara river below the falls to the top of the high bank is somewhat over 200 feet. From the top of the high bank, for about 100 feet down, the bank is almost perpendicular; and from that point it runs off at an angle of about 38 degrees to the west, towards the water's edge, rising from the water's edge about 125 feet in height in a horizontal distance of about 160 feet. The defendant was attempting to level off a sufficiently large plat of ground upon which to construct a building, and it conceived the idea of constructing a power house for the development of electrical power on this slope, immediately north of the pulp mill of the Cliff Paper Company. The power house was 60 feet in length, running north and south. For the purpose of supplying the current of water to the wheels of the power house, a penstock (being a cylinder or pipe about eight feet in diameter, made of iron) ran from the top of the high bank down along the face of the cliff for about 100 feet to the highest point of the slope; thence, from the top of the slope or angle, the penstock was laid in a trench which was dug out from the top of the slope to near the floor of the power house. This trench was dug through the refuse material, consisting of stones and earth. The trench was about 30 feet in depth, in the form of a square, with irregular and jagged edges and sides. It was about 40 feet long and about 12 feet wide. Various ledges of rock were encountered in the trench, which were leveled off in steps, called "benches." The intestate had been in the employ of the defendant for about a year; being a carpenter, but doing whatever work he was directed to do. During the winter of 1895–96 the trench in which the penstock was to be placed was blasted out, and, when the spring came, the frost coming out of the ground had a tendency to loosen earth and rock from the slope at the edge of the trench. This loose material would sometimes fall down on the men working upon the power house below. One witness testified that: "Mr. Batty had gone up to put in some boards on the north side of the cut made for the penstock. He went up to that place in the scale box of the derrick. The derrick hoisted him around to the place where he was to put up the boards. * * * To get at the point where the work of putting up these boards was to be done, a man could have got into the scale box at the top of the high bank, and be let down; that is to say, the scale box in which the men worked and stood when they were doing this work could have been brought to the top of the high bank, and the men let down in the box to any point they want to do their work, within the reach of the boom. There was no necessity for getting in the box down below, only to get the

lumber and their stuff into it." Another witness testified: "Batty got out of the box, and went after the crowbar. * * * That is when the accident happened,—when he was coming back with the crowbar, getting into the box again. It was more dirt than rock that fell. There was only one stone I saw in amongst it. It was not a very large stone. It fell from the slope where I wanted them to clean,—the place where they were going up to clean, —and exactly opposite where they had cleaned in the forenoon on the other side of the cut."

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and McLENNAN, JJ.

Morris Cohn, Jr., for appellant.
George W. Cothran, for respondent.

HARDIN, P. J. The defendant had the right to build upon this slope of the high bank of the Niagara river, and to utilize the otherwise worthless piece of land. It had the right to construct the penstock from the top of the high bank to the floor of its power house, and to excavate through the loose materials on the slope a trench from the surface of the slope to the solid rock wide enough and deep enough to place a suitable penstock therein. In the course of the body of the charge the learned trial judge said:

"The counsel for the defendant, in his address to you, stated that he did not know just what specific duty the court would call your attention to, as incumbent upon this defendant to perform. I do not call your attention to any specific duty, gentlemen. I do not say that there was any specific obligation imposed upon this defendant."

After the body of the charge was delivered, the learned counsel for the appellant made the following request:

"I ask the court to charge the jury that there must be some specific duty, and a violation or neglect of it, on the part of the defendant, and the jury must find such a specific duty, and a violation or neglect of it, before the defendant can be charged with negligence."

The request was denied, and an exception was taken. Following that, the further request was made to the court "to charge the jury that there is no evidence of any specific fact whereby negligence can be charged against the defendant." The request was denied, and an exception was taken.

The charge, as delivered, was not definite, certain, and specific, so as to inform the jury what act had been performed by the defendant, or what omission had been made by the defendant, which was, in the eye of the law, negligent. When the trial judge refused the requests made, to make a definite and specific charge of the act which was negligent on the part of the defendant, we think it committed an error. It left the jury to surmise or guess, upon the whole evidence, that the defendant had been guilty, without being required to find any specific act of negligence or omission. In Harmon v. Railroad Co., 18 D. C. 255, it was said that an instruction which leaves the question of negligence to the jury, without any guidance, or giving them any rule for determining it, is erroneous, and should not be granted. In Harley v. Manufacturing Co., 142 N. Y. 35, 36 N. E. 813, it was said:

"The master does not guaranty the safety of the servants. He is not bound to furnish them an absolutely safe place to work in, but is bound

merely to use reasonable care and prudence in providing such a place. * * * It is culpable negligence which makes the master liable, not a mere error of judgment."

In the course of the opinion delivered in Perry v. Rogers (decided by the court of appeals Nov. 22, 1898) 51 N. E. 1021, it was said:

"The law is reasonable, and does not require impossibilities; and work along any part of the face of this precipice of one hundred feet in height could not, in the very nature of things, be in a safe place."

The intestate had been in and about the work a sufficient length of time to become conscious of all the dangers incident to the work that was being carried on. We think the instruction was too vague, and the refusal to make it definite and certain was error, and that the exceptions to which we have referred present error requiring us to order a new trial.

Judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event. Inasmuch as we have reversed the judgment entered upon the verdict, it is not necessary at this time to pass upon the question raised in respect to the interest allowed thereon, and the order in respect to the interest is therefore set aside. All concur.